UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

JOSEPH SILVA,

       Plaintiff,

   v.

STEELWORKERS' UNION LOCAL 8751,

       Defendant.

C.A. No. 13-cv-13051-GAO

**REPORT AND RECOMMENDATION ON DEFENDANT'S MOTION FOR
SUMMARY JUDGMENT (Dkt. No. 84)**

CABELL, U.S.M.J.

## I.  INTRODUCTION

The plaintiff Joseph Silva ("the plaintiff" or "Silva") is a
bus driver and was at all relevant times a member of the United
Steelworkers, Local 8751 ("the Union" or "the defendant").  He
alleges that the Union breached a duty to fairly represent him in
connection with his effort to regain seniority he lost when he
took time away from work to care for a family member.  (Dkt. No.
31).[1]  The defendant moves for summary judgment on the ground that
the claim is time barred and that it did not breach any duty it
owed to the plaintiff.  The plaintiff opposes the motion.  (Dkt.
Nos. 84, 91).  Following oral argument and consideration of the

---

[1] The parties have throughout this case treated the "proposed" amended complaint
found as an appendix to Docket Entry 31 as the operative pleading.

parties' submissions, I recommend that the defendant's motion be denied.

## II.   RELEVANT FACTS

The facts are taken from the Defendant's Statement of Undisputed Material Facts, the Plaintiff's Response thereto, and various Exhibits filed in connection with the summary judgment motion.  The facts are undisputed unless otherwise noted.

### The Parties and the Collective Bargaining Agreement

Silva has been a member of the Union at various times since 1985.  (Dkt. 91-1, Plaintiff's Response to Defendant's Statement of Undisputed Material Facts in Support of its Motion for Summary Judgment ("P. SOF") ¶ 2).  The Union represents member bus drivers who work for a bus vendor that contracts with the City of Boston to provide school bus services.  (P. SOF ¶ 1, 3).  Over the years, different school bus vendors have been awarded the contract to furnish school bus transportation services for the Boston Public Schools.  (P. SOF ¶ 3).  The City of Boston and the Union have a Letter of Agreement which provides that any new bus vendor must recognize and bargain with the Union, offer continued employment to existing drivers by seniority, and agree to be bound by the terms of any existing collective bargaining agreement ("CBA").[2] (P. SOF ¶ 5).

---

[2] As such, the employer-party to the CBA is and will be referred to as the "Company" regardless of the specific bus vendor.

Under the CBA, employees gain seniority based on their continuous employment within the bargaining unit. (Dkt. 85, Defendant's Statement of Undisputed Material Facts in Support of its Motion for Summary Judgment ("Def. SOF"), Exh. C, p.23 – CBA, p.39).[3] This is significant because bus drivers in the bargaining unit are assigned to bus routes based on their seniority. (P. SOF ¶ 6).

Pursuant to the CBA, the Company will consider an employee's seniority to be terminated if among other things the employee resigns or quits. (Def. SOF, Exh. C, p.24 – CBA, p.41). The CBA allows an employee to take leaves of absence, including "Emergency Leave" to deal with an important disruption in the employee's life, such as a family member's illness. (P. SOF ¶ 9). An employee who takes Emergency Leave continues to accrue seniority up to one year, after which it is frozen. (Def. SOF, Exh. 3, p.22 – CBA, p.38).

The parties dispute whether Emergency Leave must be approved, and how an employee who wishes to take Emergency Leave must make his wishes known. (P. SOF ¶ 10-11). The Union says that the employee must fill out a request form detailing the need for the leave. (P. SOF ¶ 11). The plaintiff says that a form is not required and points to the case of another employee named Augusto dePina ("dePina"), who took Emergency Leave without filling out a

---

[3] Citations to exhibits that contain more than one page of the document on a single PDF page are cited as: Def. SOF, Exh. [], p.[] – [Title], p.[].

form, and who was able after returning to the Company after several years of separation, and after the Union prosecuted his grievance, to have his seniority frozen.  (P. SOF ¶ 10-11).

The parties also dispute whether a resignation letter is placed in an employee's file when he resigns.  (P. SOF ¶ 11).  The defendant says that the Company *may* place a copy of the resignation letter in the employee's personnel file, but does not provide a copy of the letter to the Union.  (Id.).  The plaintiff states that the Company definitely does place the resignation letter in the employee's personnel file.  (Id.).  The parties agree that the Company does not provide a copy of the resignation letter to the Union.  (Id.).

**The Plaintiff's Departure from the Company in 1999**

In 1999 the plaintiff's daughter became ill.  (P. SOF ¶ 21).  The plaintiff and his daughter's mother, Maria DaVeiga ("DaViega"),[4] met with the Company's Human Resources (HR) department to discuss the issues her illness presented.  (P. SOF ¶ 22).  Silva and DaViega conveyed to the HR representative that his daughter's health issues were interfering with his work.[5]  (P.

---

[4] Maria DaVeiga was known at the time as Maria Vicente. (P. SOF ¶ 19, n.3). She has since married and changed her name.  (Id.)  She is referred to here by her current name, Maria DaViega.

[5] The Union states that the HR representative explained to Silva and DaViega that if Silva could not afford health insurance and could not return to work, he would have to resign.  (P. SOF ¶ 26).  However, this assertion is based on what DaViega claims the HR representative said, and is therefore inadmissible hearsay and not credited at summary judgment.

SOF ¶ 26).   The plaintiff provided the Company with a piece of paper indicating that he needed a leave of absence.  (P. SOF ¶ 24).   Silva retained a copy of this document but it later was destroyed when his basement flooded.  (P. SOF ¶ 24).   The defendant contends that during this meeting the HR representative gave Silva a piece of paper and dictated a letter of resignation, which Silva wrote and signed.  (P. SOF ¶ 26).   Silva disputes this and says that he asked for a leave of absence, and did not sign any documents or write anything down on paper during this meeting.  (Def. SOF, Exh. B, p.6 – Silva Dep., p.13-14).   Silva did not bring any medical documentation from a doctor to this meeting.  (P. SOF ¶ 25).

The Union contends that Silva told a fellow co-worker that he was resigning; Silva denies telling anyone that he was resigning. (P. SOF ¶ 28).  It is undisputed that Silva stopped driving a bus for the Company after this meeting.

### The Plaintiff's Return to Work in 2006

In 2003, a new bus vendor took over the Boston Public Schools contract.  (P. SOF ¶ 30).  Before the new bus vendor took over, the old bus vendor destroyed all existing documents relating to labor relations issues and personnel files.  (P. SOF ¶ 30).  At the start of the 2005-2006 school year Silva contacted the Union because he was seeking reemployment as a bus driver in Boston and was having difficulty getting hired.  (P. SOF ¶ 31).   Around

January of 2006 the Company hired Silva as a new employee, that is, without crediting him his prior seniority.  (P. SOF ¶ 32).

**The CBA's Grievance Procedures**

Silva disagreed and believed he should have retained his seniority for his service from 1985 to 1999.  (P. SOF ¶ 33).  The CBA provides grievance procedures for employees seeking to contest seniority determinations.  (Def. SOF, Exh. C, p.35 – CBA, p.63).  Specifically, the CBA provides a three-step grievance and arbitration procedure for aggrieved employees, although the parties dispute whether the procedure as set out in the CBA is always followed.  (P. SOF ¶ 12).

Pursuant to Step 1, the grievance must be submitted in writing to the employee's supervisor within the greater of twenty (20) working days or thirty (30) calendar days from the occurrence or omission that gave rise to the grievance, or of the time the grievant and the Union should reasonably have known of said occurrence or omission.  (P. SOF ¶ 13).  The employee's supervisor then has ten (10) working days to deny the grievance or make a settlement offer.  (P. SOF ¶ 13).

If the supervisor denies the grievance, or offers the employee an unsatisfactory settlement, the grieving party has five (5) working days to move the grievance to Step 2.  (P. SOF ¶ 15).  The Union representative typically effects this move by writing "Move to Step 2" on the grievance and returning it to the Company.  (P.

SOF ¶ 15).  The Company then has ten (10) days to meet with the grievant and the Union regarding the grievance.  (P. SOF ¶ 15). Within seven (7) working days after the Step 2 hearing, the Company must render a decision on the grievance in writing.  (P. SOF ¶ 15).  If the grievance is not resolved following Step 2, the Union may submit the grievance to Step 3, which is arbitration.  (P. SOF ¶ 16 & Def. SOF, Exh. C, p.36 – CBA, p.66).  The Union does this by writing "move to arbitration" on the Step 2 denial, along with the date, and returning it to the Company.  (P. SOF ¶ 16).

### Silva's Attempts to File Seniority Grievances

Silva contends that the Union told him after the Company rehired him in 2006 that it would file a grievance to address the Company's failure to restore his seniority rights.  (P. SOF ¶¶ 33-34).  No grievance was filed at that time, however. (Id.).

Then, in June 2010, Silva asked the Union to file a grievance on his behalf.  (P. SOF ¶ 34).  The Union did so but the Company denied the grievance after Step 2.  (P. SOF ¶¶ 35, 37, 39).  The Union says it told Silva that before it could pursue arbitration on his behalf he would have to provide documentation that he had requested a leave of absence in 1999.  (P. SOF ¶ 36, 43).  Silva disputes this and states that no one ever conveyed that requirement to him.  (P. SOF ¶ 36).  The parties dispute whether the Union moved the grievance to Step 3 arbitration.  (P. SOF ¶ 41-42).  The Union points out that a 2009-2010 Company grievance log lists

Silva's grievance as one for which the Union had demanded arbitration. (P. SOF ¶ 42). On the other hand, a Union representative told DaViega that the Union was not proceeding with the plaintiff's grievance. (P. SOF ¶ 44).

Then, in 2011, and after learning that the Union had taken dePina's grievance to arbitration and helped him to regain his seniority, Silva again asked the Union to file a grievance on his behalf. (P. SOF ¶¶ 52, 54-56). The Union contends that Silva was asked to provide documentation of his 1999 request for a leave of absence; Silva denies that anyone asked him to provide documentation. (P. SOF ¶ 58). DaViega also denies that the Union ever asked for additional information to process Silva's grievances. (Def. SOF, Exh. E, p.23 - DaViega Dep., p.81). The Company denied the grievance at Steps 1 and 2. (P. SOF ¶¶ 60-61). In the Step 2 denial the Company based its denial on the fact that the event that resulted in Silva's loss of seniority occurred under another Company, and there were now no records available. (P. SOF ¶ 61).

The parties dispute whether the Union thereafter moved the 2011 grievance to arbitration. (P. SOF ¶ 62). Silva contends that the Union gave him different explanations at various times regarding the status of his two grievances. (P. SOF ¶ 64). DaViega also states that the Union told her different stories about the status of Silva's grievances. (Def. SOF, Exh. E, p.13 - DaViega

Dep., p.42).  Silva claims that he was in contact with the Union on a monthly basis and various Union representatives told him they would have to go to arbitration.  (P. SOF ¶ 70; Def. SOF, Exh. B, p. 12 - Silva Dep., p.37-38).  DaViega stated that she asked about the grievances once a month to follow up.  (Def. SOF, Exh E, p.14 - DaViega Dep., p.45).  DaViega also stated that she was consistently told that Silva's grievances would be taken care of "next year."  (Def. SOF, Exh. E, p.15-17, 21 - DaViega Dep. p.52-54, 57, 74-75).  Both Silva and DaViega state that the Union told them that Silva's grievance was going forward but that other matters such as terminations would have to be taken care of first. (Def. SOF, Exh. B, p.12 - Silva Dep. p. 39; Def. SOF, Exh. E, p.15 - DaViega Dep. p.49).  The Union disputes this and says that it advised Silva that it could not proceed with his arbitration until he provided documentation of his request for a leave of absence in 1999.  (P. SOF ¶ 69).

### Silva's Hiring of an Attorney

In the fall of 2012, Silva hired Attorney Mitchell Notis ("Attorney Notis") to facilitate his efforts to regain his seniority.  (P. SOF ¶ 73).  Attorney Notis wrote to the Union twice via letters dated December 10, 2012 and May 22, 2013.  (P. SOF ¶¶ 75, 77).

In the December 10, 2012 letter Attorney Notis asked the Union about the status of Silva's grievances, and also asked whether he

would be permitted to represent Silva at the arbitration. (Def. SOF, Exh. T). Attorney Notis stated that he only wanted to assist in whatever the Union was doing and was in no way questioning the actions taken by the Union. (Id.). The Union did not respond to this letter. (P. SOF ¶ 76).

On May 22, 2013, Attorney Notis sent the Union a second letter. (Def. SOF, Exh. U). This letter expressed concern that the Union had not yet taken steps to further the plaintiff's grievance, and stated that if that were true it would constitute a breach of the Union's duty. (Id.). At the same time, though, Attorney Notis expressed some hope that the Union had in fact moved things forward. (Id.) He asked when the arbitrations would take place, and also asked whether Silva could have his own attorney represent him at the arbitration. (Id.).

The Union contends that after receiving the May 2013 letter, an attorney for the Union named Katharine Shaw ("Attorney Shaw") prepared a written response to Attorney Notis dated June 24, 2013. (P SOF ¶ 80). Attorney Shaw stated among other things that the Union had placed Silva's grievances on hold due to a lack of evidence, but was prepared to proceed to arbitration if Silva produced evidence that he had requested a leave of absence in 1999. (P. SOF ¶ 82; Def. SOF, Exh. W).

The parties dispute whether the Union ever sent Attorney Shaw's letter but no one disputes that neither Attorney Notis nor the plaintiff ever received the letter.   (P. SOF ¶ 80).

On November 28, 2013, more than six months after Attorney Notis's May 22, 2013 second letter, but within six months of Attorney Shaw's June 24, 2013 response indicating the Union had placed the plaintiff's grievances on hold, the plaintiff commenced the present action.   (Dkt. 1).   The amended complaint sets forth a single count alleging the Union breached a duty of fair representation to the plaintiff.   (Id.).

## III. Legal Standard

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to a judgment as a matter of law." FED. R. CIV. P. 56(a).   The moving party bears the initial burden of "assert[ing] the absence of a genuine issue of material fact and then support[ing] that assertion by affidavits, admissions, or other materials of evidentiary quality." *Mulvihill v. Top-Flite Golf Co.*, 335 F.3d 15, 19 (1st Cir. 2003).   Once the moving party meets that burden, in order to avoid summary judgment the opposing party must "'show that a factual dispute does exist.'" *Fontanez-Nunez v. Janssen Ortho LLC*, 447 F.3d 50, 54-55 (1st Cir. 2006) (quoting *Ingram v. Brink's, Inc.*, 414 F.3d 222, 228-29 (1st Cir. 2005)). To do so, the opposing party must "'produce specific facts, in

suitable evidentiary form, to establish the presence of a trialworthy issue.'" *Clifford v. Barnhart*, 449 F.3d 276, 280 (1st Cir. 2006) (quoting *Triangle Trading Co. v. Robroy Indus. Inc*., 200 F.3d 1, 2 (1st Cir. 1999)).  Courts may consider any material that would be admissible at trial, but inadmissible evidence, such as hearsay, may not be considered.  *Horta v. Sullivan*, 4 F.3d 2, 8 (1st Cir. 1993).

When determining whether summary judgment is appropriate, "a court must view the record in the light most favorable to the nonmoving party and give that party the benefit of all reasonable inferences in its favor." *Clifford v. Barnhart*, 449 F.3d 276, 280 (1st Cir. 2006) (citing *Nicolo v. Philip Morris, Inc*., 201 F.3d 29, 33 (1st Cir. 2000)).  "'Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no genuine issue for trial.'" *Scott v. Harris*, 550 U.S. 372, 380 (2007) (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp*., 475 U.S. 574, 586-87 (1986)) (further internal quotation marks omitted).

## IV.   ANALYSIS

The Union argues that the amended complaint is barred because the plaintiff did not commence the lawsuit within six months of knowing or having reason to know that he had a cause of action. It argues that even if timely, the undisputed facts establish that the Union did not breach its duty of fair representation.

**<u>Whether the Claim is Time Barred</u>**

The parties agree that the Labor Management Relations Act's (LMRA) six-month statute of limitations is applicable to the plaintiff's claim. *Adorno v. Crowley Towing and Transp. Co.,* 443 F.3d 122, 126 (1st Cir. 2006). The statute begins to run "when the plaintiff knows, or reasonably should know, of the acts constituting the union's alleged wrongdoing." *Graham v. Bay State Gas Co.*, 779 F.2d 93, 94 (1st Cir. 1985) citing *Metz v. Tootsie Roll Industries, Inc.,* 715 F.2d 299, 304 (7th Cir.1983). As the plaintiff commenced this action on November 28, 2013, the issue is whether the plaintiff knew or reasonably should have known of the acts constituting the Union's alleged wrongdoing six months before then, that is, before May 28, 2013.

The defendant argues that Silva knew or should have known of the facts supporting his cause of action by December 10, 2012, when Attorney Notis sent the first letter to the Union. If not by then, the Union argues that Silva knew or should have known by May 22, 2013, the date on which Attorney Notis sent the second letter. If true, this would mean that the lawsuit was untimely because it was not commenced by November 22, 2013.

The Union argues that Silva's hiring of an attorney in and of itself demonstrates his belief that legal action was necessary because the Union had failed to act on his behalf. It argues that the content of the attorney's letters also mirrors this belief,

evidenced for example by Attorney Notis's statement in the December 10, 2012 letter that the grievance was "getting old."  The Court agrees that the letters evince escalating concern over the Union's conduct, but does not read them as demonstrating that the plaintiff knew or should have known of a cause of action against the Union.

Accepting that both letters voice some dissatisfaction and concern, the December 2012 letter more than anything expresses curiosity over the status of the plaintiff's grievances, and the likely schedule of events going forward.  Attorney Notis writes, for example, that the "purpose in writing to you at this point in time is to both determine the status of [the] grievances…, as well as to discuss representation of Mr. Silva when the grievances eventually reach arbitration." (Def. SOF, Exh. T).  Attorney Notis does make some statements regarding the slow pace of events but he closes by stressing that "we are not questioning the actions taken by [the Union]," and "only want to work with [the Union] to assist in promptly resolving these issues for Mr. Silva." (Id.).

The Union argues that even assuming the plaintiff did not know by December 10, 2012 that the Union was not going to advance his grievances to arbitration, he surely knew as much by May 22, 2013.  Among other things, the Union over that six month period had failed to respond to the December 2012 letter – underscoring the Union's inaction, and the May 22, 2013 letter moreover

expressed deeper, more serious concerns over the Union's delay in advancing the plaintiff's grievances to arbitration.

The May 22, 2013 letter does present a closer call.  Attorney Notis expresses true concern over the slow pace of the plaintiff's grievances and explicitly wonders if the Union misled the plaintiff to believe it was acting on his behalf when it in fact was doing nothing at all.  At the same time, though, Attorney Notis appears to entertain as equally plausible the possibility that the Union was advancing the grievances towards arbitration, just as it told the plaintiff it was doing, notwithstanding the still unacceptably slow pace.  He writes, for example, that "[a]ssuming that the statements made to Mr. Silva by [the Union] regarding his grievances proceeding to arbitration were true, it is beyond belief, and unacceptable, that it has taken over almost 3 years for the first of these grievances to proceed to arbitration, and the second over two years to proceed to arbitration." (Def. SOF, Exh. U).

Similarly, just as Attorney Notis writes that the Union's failure to respond to his December 2012 letter leads him to conclude that the Union "may have breached its duty of fair representation owed to Mr. Silva," he is careful not to state that he himself has reached such a conclusion, and he writes near the end of the letter that what he needs is to hear from the Union "immediately" as to "whether arbitration has actually been invoked

for these grievances, why there has been such a long delay in getting the grievances to arbitration, when it is likely the arbitrations will take place, and whether Mr. Silva can have his own attorney represent him at the arbitration hearings." (Id.).

Thus, even accepting that the May 22, 2013 letter voices ever increasing concern, what it most clearly expresses in the Court's view is angst and frustration over not knowing the status of the grievances or the Union's plan of action going forward. In that regard, Attorney Notis closes not by articulating a conclusion that the Union has breached its duty, but rather by warning that "if" the Union fails to respond, then he "will have no choice but to assume" the Union lied and breached its duty to the plaintiff. In short, the letter expresses both genuine dissatisfaction with the Union's performance and hope that the Union has nonetheless taken steps to advance the plaintiff's grievances to arbitration, and demands clarification from the Union to resolve the uncertainty.

Taken as a whole, the Court does not find that the letters show that the plaintiff knew or should have known by May 22, 2013 that the Union was not going to advance his grievances to arbitration, particularly where neither letter points to a specific event that should have given rise to such an awareness, or explicitly contradicts the plaintiff's (or DaViega's)

understanding from conversations with Union representatives that the Union was proceeding with his grievances.

By contrast, cases in this Circuit finding a plaintiff's claims to be time-barred typically involve a distinct event like a termination or lay-off triggering the six month statute of limitations. *See Adorno v. Crowley Towing And Transp. Co.*, 443 F.3d 122, 127 (1st Cir. 2006) (lay-off); *Graham v. Bay State Gas Co.,* 779 F.2d 93, 94 (1st Cir. 1985) (terminated); *Spencer v. Local 26,* 941 F.Supp.2d 193, 196-97 (D. Mass. 2013) (terminated). Even cases outside of the termination context tend to involve circumstances in which the union has actually notified the plaintiff that it would not pursue the grievance. *See e.g., Hazard v. Southern Union Co.*, 275 F.Supp.2d 214, 224 (D.R.I. 2003) (statute of limitations began to run from date of arbitration because plaintiff admitted that this is when he became aware that union would not pursue his grievance); *James v. Georgia-Pacific Corp.*, 986 F. Supp. 34, 41 (D. Me. 1997) (plaintiff failed to show genuine issue of material fact regarding timeliness of action where union formally notified plaintiff it would not grant him seniority).

None of the cases relied on by the defendant compels a different result. The defendant cites *Vadino v. A. Valey Engineers*, 903 F.2d 253 (3rd Cir. 1990) for the proposition that a plaintiff's claim materializes when he contacts an attorney.

*Vadino* does not lay out such a bright-line rule, however.  Rather, the court there noted that the "relevant statute of limitations question… [is] when [the plaintiff] knew, or should have known, that further appeals to the Union would be futile." *Vadino*, 903 F.2d at 262.  The plaintiff there did hire counsel but did so only after concluding that the union had breached its duty and that further dealings with them would be futile.  *Id.*  In the present case, Silva never testified at any time that he believed the Union had breached its duty to him or that he thought further attempts to work with the Union would be futile.  On the contrary, Silva testified that he relied on Union representations indicating that it still planned to proceed to arbitration, and his attorney similarly expressed a desire to work with the Union.

The defendant's reliance on *Metz v. Tootsie Roll Industries, Inc.,* 715 F.2d 299 (7th Cir.1983) is also not persuasive.  The defendant cites *Metz* for the proposition that union inactivity is enough to put a plaintiff on notice that the union may have breached its duty.  In that case, though, the union refused to file a grievance on the plaintiff's behalf and took no action for more than 13 months.  *Metz,* 715 F.2d at 300-01, 304.  Here, Silva reportedly contacted the Union on a monthly basis and was consistently led to believe that the Union was working on his grievances.  *See Paulo v. Cooley*, 686 F. Supp. 377, 381 (D.R.I. 1988) (genuine issue of material fact existed where "plaintiff

18

contended that he had been in continuous contact with the Union and had relied on the Union completely to inform him of his rights and to handle the grievance."); *Plumley v. Southern Container, Inc.,* No. 00-140-P-C, 2001 WL 1188469, at *11 (D. Me. October 9, 2001) (summary judgment denied where "plaintiff alleges that he repeatedly tried to get information from the Union about the status of his grievance but was told only that the Union was working on it and later that the Union had lost the paperwork but was working on it").

Finally, the defendant cites to a case from this district, *Rosario v. Paul Revere Transp., LLC*, No. 13-12633-RGS, 2014 WL 585860 (D. Mass. Feb. 13, 2014), but that case is distinguishable on the facts.  In *Rosario*, the defendant union informed the terminated plaintiff on November 7, 2012 that it had advanced his grievance towards arbitration but thereafter ignored his requests for updates made the following week, and then again three months later on February 2, 2013, and again on February 13, 2013. *Rosario*, 2014 WL 585860 at *1.  Rosario filed suit in court several months later, on September 27, 2013, and the court concluded that his claim was untimely because it was not brought within six months of the last inquiry. *Rosario*, 2014 WL 585860 at *1, 3.  The court found that Rosario should have known by February 13, 2013 from the union's complete lack of communication that it had decided not to pursue his grievance. *Rosario*, 2014 WL 585860 at *3.  Although

*Rosario* bears some similarity in posture to the present case, it differs greatly in at least one meaningful way.  While the union in *Rosario* never responded to the plaintiff's requests for a status update, the Union here regularly responded to the plaintiff's inquiries on a monthly basis and indicated it was pursing his grievances.

The present case is more akin to that of the parties in *Snay v. U.S. Postal Service*, 31 F. Supp. 2d 92 (N.D.N.Y. 1998).  The plaintiff there diligently made efforts to learn the status of her grievance and hired counsel when her individual efforts failed. *Snay,* 31 F. Supp. 2d at 99.  After her counsel sent two letters to the union, the union notified the plaintiff through a letter to her counsel that her grievance had been withdrawn. *Id*. at 96.  In considering the defendant's motion to dismiss based on the statute of limitations, the court found that the plaintiff did not have reason to know of a breach until the union informed her attorney that her grievance had been withdrawn. *Id*. at 99.  Applied here, there is no basis to find the six-month limitations period had run because there was no distinct event unambiguously putting Silva on notice that the Union did not intend to pursue his grievance. Ironically, had Silva received Attorney Shaw's letter stating the Union had placed his grievances on hold, the Union could not then seriously contend the lawsuit was untimely where Silva commenced action within six months of the letter.

20

In short, summary judgment is not appropriate on this ground.

**Breach of the Duty of Fair Representation**

The defendant argues that assuming the merits are reached, it did not breach its duty of fair representation because: 1) it had discretion to handle the grievances in the manner it did; and 2) there is no evidence that it misrepresented the status of the plaintiff's grievances.

"The duty of fair representation is inferred from unions' exclusive authority under the National Labor Relations Act to represent all employees in a bargaining unit." *Chauffeurs, Teamsters and Helpers, Local No. 391 v. Terry*, 494 U.S. 558, 563 (1990) (internal citations omitted).  Suits for breach of this duty by the union are "inextricably interdependent" with suits against an employer under § 301 of the LMRA.  *DelCostello v. International Broth. Of Teamsters*, 462 U.S. 151, 164 (1983); 29 U.S.C. § 185.

A union breaches its duty "only when [its] conduct toward a member of the collective bargaining unit is arbitrary, discriminatory, or in bad faith." *Vaca v. Sipes*, 386 U.S. 171, 190 (1967).  "In order to successfully defend against a motion for summary judgment on a duty of fair representation claim, the plaintiff must point the court to record evidence supporting any one or all of these elements." *Morales-Vallellanes v. Potter*, 339 F.3d 9, 16 (1st Cir. 2003).  Bad faith encompasses fraud,

dishonesty, and other intentionally misleading conduct. *See, e.g., Baxter v. United Paperworkers Int'l Union, Local 7370*, 140 F.3d 745, 747 (8th Cir. 1998); *Mock v. T.G. & Y. Stores Co.,* 971 F.2d 522, 531 (10th Cir. 1992). A union's actions are arbitrary "'only if, in light of the factual and legal landscape at the time of the union's actions, the union's behavior is so far outside a 'wide range of reasonableness' as to be irrational.'" *Miller v. U.S. Postal Service*, 985 F.2d 9, 11-12 (1st Cir. 1993) (citing *Air Line Pilots Ass'n Int'l v. O'Neill*, 499 U.S. 65, 67 (1991)).

The Union argues that it acted reasonably because, when all is said and done, it has preserved the right to arbitrate Silva's grievance, albeit upon receipt of documentation supporting his claims. It argues also that it did not breach its duty of fair representation by not scheduling the grievances for arbitration because it reasonably believed that Silva resigned in 1999 and therefore was unlikely to prevail at arbitration. The Union asserts that it nonetheless remains prepared to advance Silva's grievances to arbitration upon receipt of sufficient documentation to show he sought a leave of absence. For these reasons, the Union argues, it is immaterial whether Silva resigned or asked for a leave of absence, and immaterial whether he was told of the need to provide additional documentation before his grievances could be advanced.

But Silva does not just question the soundness or reasonableness of the Union's ultimate decision to place his grievances on hold. He contends that Union officials never told him they had placed his grievances on hold, never asked him for additional information, and consistently lied to him and misled him into believing that the Union was advancing his grievances when in fact it was not doing anything at all. If true, these facts could form the basis of a claim for breach of the duty of fair representation. *Alicia v. Suffield Poultry, Inc.*, 902 F.2d 125, 130 (1st Cir. 1990) ("A number of courts have recognized that union misrepresentations may serve as the basis for fair representation claims…. Holding a union responsible for serious misrepresentations that lack rational justification or are improperly motivated is consistent with the union's obligation to deal honestly and fairly with its members."). *See also Bautista v. Pan American World Airlines, Inc.*, 828 F.2d 546, 550 (9th Cir. 1987) ("Intentionally misleading statements by union officials designed to persuade members to join in collective action, such as a strike or ratification of a newly negotiated agreement, can supply the bad faith necessary to a DFR violation"); *Swatts v. United Steelworkers of America*, 808 F.2d 1221, 1225 (7th Cir. 1986) ("intentional, invidious, [and] affirmative misstatement[s are] consistent with what this circuit has required [for] finding a

breach of the duty of fair representation in the context of a union's handling of grievances.").

In addition, Silva contends that even absent documentation showing that he had requested leave, the Union could have successfully taken his grievances to arbitration, just as it did for dePina even where his claim was untimely, but chose not to do so. If true, a jury could find that the Union acted arbitrarily in its processing of the plaintiff's grievances.

Against this backdrop, a number of material facts are in dispute. There is a genuine dispute as to whether Union officials told Silva that they had placed his grievances on hold pending documentation that he requested a leave of absence in 1999. There is also a genuine dispute as to whether Union representatives affirmatively and falsely told Silva they were planning to take the grievances to arbitration, or misled him by giving him suggestive answers that allowed him to believe as much. A jury resolving these factual disputes in the plaintiff's favor might reasonably conclude that the Union acted in bad faith or arbitrarily, and thus breached its duty of fair representation to the plaintiff. Summary judgment therefore is not appropriate. *See e.g., Union of Sec. Personnel of Hospitals*, 267 NLRB No. 155, Case 29-CB-4450 (August 26, 1983) (union breached duty of fair representation by abandoning grievance filed by member and willfully misinforming him about status of grievance); *see also*

*Sheehan v. U.S. Postal Service*, 6 F. Supp. 2d 141, 150 (N.D.N.Y. 1997) ("alleged misrepresentation regarding the status of plaintiff's appeal constitutes a breach of the duty of fair representation").

To be sure, the Union argues that even if it made misrepresentations to the plaintiff (and DaViega), those misrepresentations cannot constitute a breach of the duty of fair representation because the Union has always remained willing and able to arbitrate the plaintiff's grievances upon receipt of sufficient documentation, which means that the plaintiff is in the same position now that he was in 2010-2011, and has not actually suffered any harm. In so many words, then, the Union argues no harm, no foul. *See Ackley v. Western Conference of Teamsters*, 958 F.2d 1463, 1472 (9th Cir. 1992) ("plaintiffs must demonstrate 'a causal relationship between the alleged misrepresentations and their injury.'"). But it is not settled from the record that the plaintiff has not already suffered harm from the delay in advancing his grievances to arbitration. Among other things, Attorney Notis stated in the May 22, 2013 letter that a new company had taken over the contract and seniority was to be used to make hiring decisions. Similarly, Silva testified that an employee's seniority level plays a role in the number of hours offered to the employee for work, and thus affects an employee's potential capacity for income and retirement benefits. (Def. SOF, Exh. B,

p.19 - Silva Dep. 67-68).   As such, misrepresentations which prevented the plaintiff from advancing his grievances and potentially regaining his lost seniority could have harmed the plaintiff financially by affecting his overall earnings and his eligibility to compete for certain positions.

## V.   CONCLUSION

In light of the foregoing, the Court recommends that the defendant's motion for summary judgment be DENIED.  (Dkt. No. 84). The parties are hereby advised that under the provisions of Fed. R. Civ. P. 72(b), any party who objects to these proposed findings and recommendations must file specific written objections thereto with the Clerk of this Court within 14 days of the party's receipt of this Report and Recommendation.   The written objections must specifically identify the portion of the proposed findings, recommendations, or report to which objection is made and the basis for such objections.   The parties are further advised that the United States Court of Appeals for this Circuit has repeatedly indicated that failure to comply with Fed. R. Civ. P. 72(b), will preclude further appellate review of the District Court's order based on this Report and Recommendation.  *See Keating v. Secretary of Health and Human Services*, 848 F.2d 271 (1st Cir. 1988); *United States v. Emiliano Valencia-Copete*, 792 F.2d 4 (1st Cir. 1986); *Park Motor Mart, Inc. v. Ford Motor Co.*, 616 F.2d 603 (1st Cir. 1980); *United States v. Vega*, 678 F.2d 376, 378-379 (1st Cir.

1982); *Scott v. Schweiker*, 702 F.2d 13, 14 (1st Cir. 1983); *see also Thomas v. Arn*, 474 U.S. 140, 106 S. Ct. 466 (1985).

<u>/s/ Donald L. Cabell</u>
DONALD L. CABELL, U.S.M.J.

DATED:  March 6, 2017